1  CAMPEAU GOODSELL SMITH, L.C.
   SCOTT L. GOODSELL, 122223
2  KARI L. SILVA, #257033
   440 N. 1st Street, Suite 100
3  San Jose, California   95112
   Telephone:  (408) 295-9555
4
   ATTORNEYS FOR
5  Interested Party Oxana Wootton

6              UNITED STATES BANKRUPTCY COURT

7             NORTHERN DISTRICT OF CALIFORNIA

8                    SAN JOSE DIVISION

9

10                                    )  CHAPTER 13
                                      )
11 In re:                             )  Case No: 09-57389 ASW
                                      )
12 Alan T. and Wendy Lynn Wootton     )  CREDITOR OXANA WOOTTON 'S PRE-
                                      )  HEARING CONFERENCE STATEMENT
13              Debtors.              )
                                      )
14                                    )  Date:        April 5, 2011
                                      )  Time:         1:45 p.m.
15                                    )  Location:   United States Bankruptcy
                                      )              Court, 280 South First St.,
16                                    )              San Jose, CA
                                      )              Courtroom: 3070
17                                    )  Judge:       Hon. Arthur Weissbrodt
                                      )
18 _____   )

19

20      CREDITOR, OXANA WOOTTON , the former spouse of debtor Alan T. Wootton  (the

21 "Objecting Party" and/or  "Wootton") as and for the Pre-hearing Conference Statement, states as

22 follows:

23      **I.   Status of Case and Response to Continuation**

24      Debtors Alan and Wendy Wootton ("Debtors") filed for bankruptcy protection on August 31, 2009.

25 Debtors' petition claimed no secured claims; $27,000 in support obligations; $5,625 in tax obligations;

26 and unsecured claims of $72,395.00.  Debtors proposed plan is to pay creditors $42,000 based on $700

27 a month for 60 months.   Objecting Party, the former spouse of Alan Wootton ("Debtor"), filed a proof

28

                                         1
Case: 09-57389   Doc# 75   Filed: 03/28/11   Entered: 03/28/11 21:21:56   Page 1 of 24
CREDITOR OXANA WOOTTON 'S PRE-HEARING CONFERENCE STATEMENT

of claim for $102,659.00 of which $74,731 is entitled to priority as support arrears.

   a. <u>Wootton 's Objections</u>

      1. Wootton objected to Debtors' plan confirmation in October 2009, based on:

        a. The plan was not proposed in good faith as required by 11 U.S.C. §1325(a)(3) inasmuch as debtor failed to comply with the terms of the Family Court orders, disposed of and/or concealed assets in violation of those orders, seeks to discharge debt that otherwise is not dischargeable.

        b. The petition was not filed in good faith as required by 11 USC §1325(a)(3) inasmuch as the primary purpose of filing appears to have been to avoid the effect of the orders of the Family Court to make various payments to Oxana Wootton from community assets.

        c. The plan violates 11 U.S.C. §1325(a)(8) inasmuch as Debtor failed to pay since the filing of his bankruptcy petition all domestic support obligations.

        d. The plan violates 11 U.S.C. §1325(a)(6) inasmuch as it provides insufficient payments to permit the Debtors to pay all amounts due. The plan fails to provide an adequate means for the payment of full domestic support obligations within 60 months and is therefore unconfirmable.

      2. Objecting Party supplemented her objection on May 5, 2010 for violations of §1325(a)(3):

        a. Debtor Alan Wootton perjured himself, failing to list 125,000 shares of PLAYDOM stock in his schedules and then denying their existence while under oath at his 341 meeting of creditors.

        b. No progress towards resolution of child support arrears has occurred. Even though Debtor's counsel stated an objection to the proof of claim against Objecting Party would be necessary, but no such objection has been filed.

b. <u>Current Status on the Outstanding Disputes</u>

    1.  Post petition Support Arrears

Debtor may be current on his post-petition support payments. However, there is one issue that needs to be resolved prior to Objecting Party removing her objection. Currently the Debtor is using this bankruptcy filing as a basis not to pay for his two youngest children's day care expenses. Objecting Party is working with her family law attorney and her bankruptcy attorneys, Campeau Goodsell Smith ("CGS") to see if this is a failure to do something that he is legally required to. Once this issue is resolved, and if Debtor is current then Objecting Party will remove this one objection.

    2.  Remaining Objections

In regards to the all other objections they remain unresolved. Objecting Party anticipates supplementing her prior objections and bringing a motion to dismiss or convert this case to a Chapter 7 for Debtors actions that were not done in good faith.

c. <u>Progress Towards Resolution of the Disputes.</u>

Objecting Party filed a motion for relief from stay to litigate the terms of support in the family court in September 2010 and the motion was heard before this Court on September 22, 2010. The order was entered on November 3, 2010. Objecting Party then began working with her family law counsel to file the necessary documents in state court.

This matter was placed on hold after, Debtors' previous counsel, The Fuller Law Group "Previous Counsel" informed CGS that they would not be objecting to Wotton's proof of claim. In addition, CGS received confirmation that they were close to providing a 100% plan. (See exhibit "A"). Based on that representation all state court action was placed on hold as were all other matters related to this case.

On or about February 7, 2011, a day before the confirmation hearing a pre-hearing conference

3

statement was filed indicating that Debtor had hired new counsel, Brooke Miller of Miller Legal Services ("Debtor's Counsel"). As this case has been pending for over a year and a half, Objecting Party decided it would be more cost effective to provide Debtor's Counsel with a summary of the matter and her position with the hope that this matter could be quickly resolved. (See Exhibit "B".)

On or about March 14, 2011 Debtors counsel stated they would be proposing a 100% plan. After pushing for specifics on the plan terms, Debtor's Counsel then stated that they would be objecting to Oxana's proof of claim. However, she requested additional time to talk with her client and requested that Objecting Party not take any action in the family court. (See Exhibit "C").

Subsequently, Debtor's Counsel provided an email that they would be objecting to Wootton 's proof of claim. (See Exhibit "D"). Due to Objecting Party 's reliance on Debtor's representation the litigation in state court has been delayed. Objecting Party's family law attorney believes the dispute in family court will be a long cause and may not be resolved for months.

## II. Potential Depletion of Bankruptcy Assets

a. <u>Hearing on Motions for Relief</u>

On September 22, 2010 motions for relief from the automatic stay to [1] litigate the terms of support in the Santa Clara Superior Court ("Motion 1") and [2] to impound and distribute the funds earned from the sale of Playdom Inc. Stock ("Motion 2") were heard on shortened notice before this court. The hearing was expedited based on Debtors receipt of $136,000 from the sale of their PLAYDOM Inc. stock. The stock was a contingent interest belonging to the bankruptcy estate under 11 U.S.C §541 at the date of the bankruptcy filing, but was not listed in Debtors bankruptcy schedules. Of the $136,000.00 received from the sale of the PLAYDOM stock, Debtor placed in trust $94,941.00

b. <u>Additional Funds Disclosed.</u>

In about December 2010, CGS was notified by Previous Counsel that Debtor was receiving

approximately $10,000.00 per month for the sale of his PLAYDOM stock. CGS requested the funds be placed in trust and requested that documents relating to those funds be provided to Objecting Party. Previous Counsel agreed, but the documents were never provided and CGS never received confirmation that the funds were placed in trust.

When Debtor's Counsel was hired, CGS again requested the funds be placed in trust and documentation be provided. To date, CGS has not received a response. Based on Debtor's previous actions, Objecting Party is concerned that these funds are being spent improperly.

## III. Discovery

As stated in Debtor's pre-hearing statement, Objecting Party is preparing to conduct a 2004 examination of the Debtor to locate and verify assets belonging to the bankruptcy estate. Debtor's counsel has agreed to dates for the examination, but now believes the 2004 examination is improper and will not stipulate to the 2004 exam.

## IV. Continuance and future steps

Objecting Party will agree to one final 60-day continuance, but if a resolution cannot be achieved between the parties and a plan filed and served, Objecting Party anticipates filing a motion to convert this matter to a Chapter 7 or dismiss the case based on Debtor's failure to act in good faith.

Dated: March 28, 2011                    Respectfully Submitted,

CAMPEAU GOODSELL SMITH

By:  /s/: Kari L. Silva____
          Kari L. Silva
          Attorneys for Oxana Wootton

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

Case: 09-57389     Doc# 75     Filed: 03/28/11     Entered: 03/28/11 21:21:56     Page 6 of 24

# The Fuller Law Firm, PC

1440 Broadway Suite 313
Oakland, CA 94612
Tel. (510) 444-3613

60 No. Keeble Ave.
San Jose, CA 95126
Tel. (408)295-5595
Fax. (408)295-9852

9 W. Gabilan Ave. Suite 17
Salinas, CA 93901
Tel. (831) 758-6588

Please reply to our San Jose office

January 13, 2011

Campeau Goodsell Smith, L.C.
Kari L. Silva, Esq.
440 N. 1st Street, Suite 100
San Jose, California 95112

Via Facsimile to:  408-295-6606
Hard copy will not follow

| | Re: | Debtors | : | Alan & Wendy Wootton |
| | | Case No. | : | 09-57389 ASW |

Dear Ms. Silva:

I had a lengthy discussion with my clients this afternoon.  I believe that, very shortly, we will propose a 100% plan.  Indeed, we may even be able to file the plan in time for confirmation at the next pre-hearing conference.

As soon as I have additional information, I will contact you.

Sincerely yours,

/s/

Sam Taherian

# FAX

| | |
|---|---|
| **Date:** 1/13/2011 5:38 | |
| Number of pages including cover | *2* |

**To:**

Kari L. Silva, Esq.

**Phone:**

**Fax Phone:** +1 (408) 295-6606

**From:**

Fuller Law Firm

Fuller Law Firm

60 N Keeble Ave

San Jose                        CA

95126

**Phone:**        +1 (408) 295-5595

**Fax Phone:** +1 (408) 295-9852

*REMARKS:*

# EXHIBIT "B"

LAW OFFICES

# CAMPEAU GOODSELL SMITH

A LAW CORPORATION

440 N. 1ST STREET, SUITE 100

SAN JOSE, CALIFORNIA 95112-4024

TELEPHONE: (408) 295-9555

FACSIMILE: (408) 295-6606

SCOTT L. GOODSELL
GREGORY J. CHARLES
WILLIAM J. HEALY
KARI L. SILVA

KENNETH J. CAMPEAU
*OF COUNSEL*

February 16, 2011

Brooke Miller, Esq.                                                      *Via Email Only*
Miller Legal Services
158 Shrader St Apt 3
San Francisco, CA 94117
brookelmiller@gmail.com

> Re: *In re Alan T. and Wendy Lynn Wootton, debtors*;
> USBC (Northern District)(San Jose Div.) Case No.: 09-57389 ASW

Dear Brooke:

It was a pleasure speaking with you last week. I truly hope that we can quickly resolve the outstanding disputes between your client, Alan Wootton, and my client, his former spouse, Oxana Wootton.

Attached is an excel spreadsheet prepared by our client which outlines the amount of money Alan owes her. I have not attached the documents submitted in Oxana's proof of claim as I am sure you already have that information. Basically, the claim is separated into two distinct categories. The first and largest claim is for child and spousal support arrears the second claim is for the equalization payment of their community property.

Child and Spousal Support

As you are aware Child/ Spousal support is a priority non-dischargeable debt that must be paid in full in the life of the Chapter 13 plan. §§11 USC 507, 523, 1322, 1328. Child and spousal support arrears accrue interest at 10% per year Cal. Code of Civ Proc. §685.010. To the extent the support and interest are not paid during the life of the Chapter 13 plan, the support arrears and interest is still owed post bankruptcy discharge. See, §11 USC 1328; attached memorandum of Decision written by Judge Weissbrodt.

//
//

Equalization Payment

The second claim that Oxana has is for an equalization payment based on the division of the community property at the time of their divorce. The stipulations entered by Oxana and Alan call for certain payments by Alan and certain payments by Oxana. It should be noted that the division incorporated past child support arrears and therefore may be considered a support obligation. The stipulation required Oxana to sell her Ebay stock upon demand by Alan and required Alan to make a cash payment to Oxana. Alan ordered Oxana to sell her Ebay stock, which she did. However, Alan then failed to provide her with the cash payment he was required to make. Therefore, Oxana did not provide him with his interest in the stock proceeds. The forced sale triggered additional tax obligations for Oxana. Based on the mutual breach Alan has a claim against Oxana and Oxana has a claim against Alan. Accounting for Alan's setoff the equalization payment to Oxana totals $21,743.09 (see proof of claim for further information). Although an equalization payment is a priority non-dischargeable debt in a Chapter 7, it does not maintain that status in a Chapter 13 and therefore the proof of claim lists the equalization payment as a general unsecured claim. §§523(a)(5) and 1328(a)(2).

Chapter 13 Plan Payment

A chapter 13 plan must meet two requirements and if both requirements are not met then a plan cannot be confirmed: 1) the debtor must commit all disposable income to its Chapter 13 plan (§1325(b)(1)(B)) and 2) a debtor must pay their creditors the value of their non-exempt assets, referred to as the best interest of the creditors test. §1325(a)(4)

a.     Disposable Income

Generally, disposable income is determined by the mechanical means of projected disposable income (PDI) outlined in §11 USC 1325(b)(1)(B). Sam argued that based on the PDI Debtor's plan contributed all that was required. Previously, the 9th circuit took a very mechanical approach to projected disposable income and plan payments. However, that mechanical approach was recently rejected by the United States Supreme Court in Hamilton v. Lanning, 130 S. Ct. 2464 (U.S. 2010). The court specifically stated at pg 2478:

> Consistent with the text of § 1325 and pre-BAPCPA practice, we hold that when a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation. (Emphasis added)

At the time of the bankruptcy filing, Alan's monthly income was listed as $13,333 and was stated in Form 22C as $11,883 per month. The Debtors proposed a plan payment of $700

per month which is less then the $918 per month disposable income in schedule I and J.  Form 22C, also appears to have numerous errors.

Based on the information we received from Sam, Alan's income has increased from the date of their bankruptcy filing, and that increased income should be used to pay their creditors.  It is my understanding that Alan is currently earning $20,000 per month, which would provide Alan and Wendy with an additional $6,667 to pay their creditors. Over 60 months Alan and Wendy are able to pay $455,100.00 to their creditors, which is more then their outstanding debt. Based on this information, Oxana believes that Alan and Wendy should propose a 100% plan.  If you disagree please provide our office with a basis for your position.  Additionally, we would appreciate all pay advices and information on any other income received for the past 90 days so we can ascertain Alan's salary.  Please also confirm that Wendy is not currently working.

b.      Bankruptcy Assets and the Best Interest Test

Generally speaking, the best interest test is based on a liquidation analysis. The liquidation analysis takes all bankruptcy assets applies the exemptions and the funds or value of the assets that exceed the exemptions must be paid to the creditors.

Bankruptcy assets in a Chapter 7 are described in §541.  Property of the estate includes all contingent and non-contingent interests.  The estate does not include wages that are received post-bankruptcy filing.  Bankruptcy assets in a Chapter 13 are defined in §1306.  Property of the estate includes all assets listed in 11 USC 541, but it also includes wages as property of the estate.

Sam filed an adversary action citing *Allen v. Levy* (In Re Allen) 226 BR 857 (Bankr. N.D. Ill 1998) and *In Re Laton,* 261 B.R. 774 (Bankr M.D. FL 2001)  for the proposition that Alan's PLAYDOM stock was not entirely property of the estate based on the formula in those two cases. Sam's premise was wrong, because the formula in those cases only apply in a Chapter 7 and not in a Chapter 13.  The court in its ruling on our motion to dismiss allowed the Debtor leave to amend their complaint, but the court stated that §11 USC 1306 would apply and addressed its effect, essentially stating that based on §1306 the stock proceeds were property of the estate.  In addition, the court had already ruled during our motion for relief from the automatic stay that all proceeds received from the sale of the PLAYDOM stock was property of the estate.

Prior to filing our motion to dismiss, we asked Sam to dismiss Alan's compliant and informed him that the complaint failed to refer to applicable law, but he failed to do so.  A few weeks prior to the motion to dismiss the complaint, Sam informed me that the Debtors had no issue contributing all funds held in trust to the plan, but the complaint was filed to determine if the continued monthly payments of the PLAYDOM stock were property of the estate.  Prior to this conversation my client and I were unaware of these continue payments.  As discussed with Sam,

to the extent that the monthly payments are from the sale of the PLAYDOM stock, then those monthly payments are clearly property of the estate.  We have requested, but have not received, any information relating to the continued payments.  In addition, Sam informed us that the monthly payments would be placed in trust until a plan was confirmed, but I have not received confirmation that this has happened.  Please note that we will require an accounting of all these funds and if any of those funds have been spent it is a basis for contempt of a court order.

Attorney Fees

In *Travelers*, the Supreme Court ruled that a creditor is entitled to attorney fees, See *Travelers Case. & Sur. Co. Amv. PG&E*, 549 US 443 (US 2007). When a state statute allows for attorney fees those may also be collected within the bankruptcy court *Busch v Hancock* (in re Busch, 369 B.R. 614 (B.A.P. 10th Cir. 2007).  In California, a custodial parent is entitled to attorney fees to collect on an outstanding support obligation. Cal. Fam. Code §3557.

At the time of the bankruptcy filing, Alan was employed with Playdom and was entitled to stock options.  Those stock options were not listed in the petition.  At the 341 hearing, Alan was asked, "with your current employer have you been granted any stock options or stock or any other non-cash benefits?"  in which Alan replied "NO".  Please see the following email where you will find a summary of the questions and also an audio file of the hearing.

As it turned out, Alan did own interest in PLAYDOM and those stocks were very valuable.  Oxana has had to incur enormous attorney fees to recover those assets for the bankruptcy estate so she can collect her support arrears.  Through the end of November our client has incurred legal fees with our firm of $23, 535 and this does not include the attorney fees she has incurred with her previous counsel.  Additionally, she has not received reimbursement of her support arrears since the filing of this Chapter 13 in 2009.  Oxana is seeking a settlement payment of the costs incurred to collect on her support arrears.

Conclusion

To summarize, our client would like to receive 100% of what she is owed and recover the attorney fees she has had to incur to recover her support arrears.  As the interest on the support arrears is continuing to accrue, our client would like to propose that the support arrears and attorney fees be paid within the first six months of the plan and the equalization payment can be paid through the life of the plan.  The original proof of claim was filed in 2009 and the claim is continuing to increase due to the 10% interest that is accruing.  To address this issue, your client can propose a plan to pay post petition interest or we can file an amended claim that includes the outstanding interest.

It is my understanding that your client disagrees with the amount of support arrears. If your client has a different number, please provide that to our office with the documentation that supports your client's number so we can review the information.

If our clients cannot agree on a support amount, then the matter will need to go to the family court. As stated yesterday, Oxana's family law attorney is prepared to file the necessary documents in family court to determine support arrears, but the complaint was not filed as we were informed that Alan would be proposing a 100% plan and was not going to object to the proof of claim.

Hopefully, we can resolve any outstanding issues regarding support as a failure to do so will only prolong the bankruptcy process and require additional attorney fees which we will seek reimbursement for.

Sincerely,

/s/: *Kari L. Silva*
Kari L. Silva
Campeau Goodsell Smith

Enclosures: As indicated

**Support payments**

| Date | Child support | Child care expenses | Spousal support | Other expenses | Total Due to Oxana (for each month) | Payments by Alan | Still owed to Oxana | Interest (10%/year) | Total owed to Oxana | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | $0.00 | | | |
| September-07 | $2,984.00 | $1,260.00 | $746.00 | $0.00 | $4,990.00 | $6,163.31 | -$1,173.31 | $0.00 | -$1,173.31 | - Alan made 2 payments, of $4102.00 and $2061.31 |
| October-07 | $2,984.00 | $1,260.00 | $746.00 | $0.00 | $4,990.00 | $4,102.62 | -$285.93 | $0.00 | -$285.93 | - Alan made 2 payments, of $2051.31 each |
| November-07 | $2,984.00 | $1,260.00 | $746.00 | $0.00 | $4,990.00 | $0.00 | $4,704.07 | $39.20 | $4,743.27 | |
| December-07 | $2,984.00 | $1,260.00 | $746.00 | $0.00 | $4,990.00 | $0.00 | $9,694.07 | $119.98 | $9,814.05 | |
| January-08 | $2,984.00 | $1,260.00 | $746.00 | $0.00 | $4,990.00 | $9,980.00 | $4,704.07 | $159.19 | $4,863.26 | - Alan made 2 payments, of $5000.00 and $4980.00 |
| February-08 | $2,984.00 | $1,260.00 | $746.00 | $0.00 | $4,990.00 | $0.00 | $9,694.07 | $239.97 | $9,934.04 | |
| March-08 | $2,984.00 | $1,260.00 | $746.00 | $0.00 | $4,990.00 | $4,990.00 | $9,694.07 | $320.75 | $10,014.82 | |
| April-08 | $2,984.00 | $1,260.00 | $746.00 | $0.00 | $4,990.00 | $0.00 | $14,684.07 | $443.12 | $15,127.19 | |
| May-08 | $2,613.55 | $1,260.00 | $746.00 | $0.00 | $4,619.55 | $0.00 | $19,303.62 | $603.98 | $19,907.60 | - On May 14, 2008, Child support + Child care expenses changed to $3606<br>- Child support owed for this month pro-rated at 13 days of $2984/month plus 18 days of $2346/month ($3606 - 1260) |
| June-08 | $2,346.00 | $1,260.00 | $746.00 | $151.50 | $4,503.50 | $0.00 | $23,807.12 | $802.38 | $24,609.49 | - Includes $151.50 in summer child care costs for Sasha |
| July-08 | $2,303.68 | $1,260.00 | $746.00 | $581.50 | $4,891.18 | $0.00 | $28,698.30 | $1,041.53 | $29,739.82 | - On July 28, 2008, Child support + Child care expenses changed to $3278<br>- Child support owed for this month pro-rated at 27 days of $2346/month plus 4 days of $2018/month<br>- Includes summer child care costs for Sasha |
| August-08 | $2,018.00 | $1,260.00 | $746.00 | $501.00 | $4,525.00 | $4,780.00 | $28,443.30 | $1,278.56 | $29,721.85 | - Includes $501 in summer child care costs for Sasha |
| September-08 | $2,018.00 | $1,260.00 | $746.00 | $0.00 | $4,024.00 | $0.00 | $32,467.30 | $1,549.12 | $34,016.41 | |
| October-08 | $2,018.00 | $1,260.00 | $746.00 | $0.00 | $4,024.00 | $0.00 | $36,491.30 | $1,853.21 | $38,344.51 | |
| November-08 | $2,018.00 | $1,260.00 | $746.00 | $0.00 | $4,024.00 | $0.00 | $40,515.30 | $2,190.84 | $42,706.13 | |
| December-08 | $2,018.00 | $1,260.00 | $746.00 | $0.00 | $4,024.00 | $0.00 | $44,539.30 | $2,562.00 | $47,101.30 | - On December 5. 2008, Alan filed for hearing to reduce Child support (but not Child care expenses) to $0. No hearing or stipulation was held for this request. If granted, the Child Support column should be changed to $0. |
| January-09 | $2,018.00 | $1,260.00 | $746.00 | $0.00 | $4,024.00 | $0.00 | $48,563.30 | $2,966.69 | $51,529.99 | - Same notes as above line |
| February-09 | $1,904.43 | $1,260.00 | $746.00 | $0.00 | $3,910.43 | $0.00 | $52,473.73 | $3,403.97 | $55,877.70 | - Same notes as above line<br>- On February 19,2009, base Child support changed to $1700.<br>- Child support for this month pro-rated at 18 days of $2018/month plus 10 days of $1700/month |
| March-09 | $1,700.00 | $1,260.00 | $746.00 | $0.00 | $3,706.00 | $0.00 | $56,179.73 | $3,872.14 | $60,051.86 | |
| April-09 | $1,700.00 | $1,260.00 | $746.00 | $0.00 | $3,706.00 | $1,200.00 | $58,685.73 | $4,361.19 | $63,046.91 | |
| May-09 | $1,700.00 | $1,260.00 | $746.00 | $0.00 | $3,706.00 | $1,200.00 | $61,191.73 | $4,871.12 | $66,062.84 | |
| June-09 | $1,700.00 | $1,260.00 | $746.00 | $0.00 | $3,706.00 | $1,200.00 | $63,697.73 | $5,401.93 | $69,099.66 | |
| July-09 | $1,700.00 | $1,260.00 | $746.00 | $0.00 | $3,706.00 | $1,200.00 | $66,203.73 | $5,953.63 | $72,157.36 | |
| August-09 | $1,700.00 | $1,260.00 | $746.00 | $0.00 | $3,706.00 | $1,700.00 | $68,209.73 | $6,522.04 | $74,731.77 | Payment received in Sept, but email from Alan confirms it was Aug payment late |
| September-09 | $1,700.00 | $900.00 | $746.00 | $0.00 | $3,346.00 | $0.00 | $71,555.73 | $7,118.34 | $78,674.07 | Stipulation changed child care to $900/month |
| October-09 | $1,700.00 | $900.00 | $746.00 | $0.00 | $3,346.00 | $1,700.00 | $73,201.73 | $7,728.36 | $80,930.08 | |
| November-09 | $1,700.00 | $900.00 | $746.00 | $0.00 | $3,346.00 | $850.00 | $75,697.73 | $8,359.17 | $84,056.90 | |
| December-09 | $1,700.00 | $900.00 | $746.00 | $0.00 | $3,346.00 | $1,700.00 | $77,343.73 | $9,003.70 | $86,347.43 | Two payments of $850 |
| January-10 | $1,700.00 | $900.00 | $746.00 | $0.00 | $3,346.00 | $850.00 | $79,839.73 | $9,669.03 | $89,508.76 | |
| February-10 | $1,700.00 | $900.00 | $0.00 | $0.00 | $2,600.00 | $3,400.00 | $79,039.73 | $10,327.70 | $89,367.42 | Spousal support ended |
| March-10 | $1,700.00 | $900.00 | $0.00 | $0.00 | $2,600.00 | $11,215.00 | $70,424.73 | $10,914.57 | $81,339.30 | 3 checks of $850, one of $4935, one of $3730 |
| April-10 | $1,700.00 | $900.00 | $0.00 | $0.00 | $2,600.00 | $0.00 | $73,024.73 | $11,523.11 | $84,547.84 | |
| May-10 | $1,700.00 | $900.00 | $0.00 | $0.00 | $2,600.00 | $3,255.00 | $72,369.73 | $12,126.19 | $84,495.92 | 2 checks of $850 and $2405 |
| June-10 | $1,700.00 | $900.00 | $0.00 | $0.00 | $2,600.00 | $0.00 | $74,969.73 | $12,750.94 | $87,720.66 | |
| July-10 | $1,700.00 | $900.00 | $0.00 | $0.00 | $2,600.00 | $4,810.00 | $72,759.73 | $13,357.27 | $86,116.99 | 2 checks of $2405 each |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| August-10 | $1,700.00 | $900.00 | $0.00 | $0.00 | $2,600.00 | $2,405.00 | $72,954.73 | $13,965.23 | $86,919.95 | 1 check $2405 |
| September-10 | $1,700.00 | $500.00 | $0.00 | $0.00 | $2,200.00 | $5,245.00 | $69,909.73 | $14,547.81 | $84,457.53 | 3 checks of $705, $2200 and $2340; Custody stipulation changed child care to "one-half of the fees which would have been incurred if Katya had attended kindergarten at public school and attended the after-school care program available there". I estimate $500. |
| Oct-10 | $1,700.00 | $500.00 | $0.00 | $0.00 | $2,200.00 | $2,200.00 | $69,909.73 | $15,130.39 | $85,040.11 | |
| Nov-10 | $1,700.00 | $500.00 | $0.00 | $0.00 | $2,200.00 | $2,200.00 | $69,909.73 | $15,712.97 | $85,622.69 | |
| Dec-10 | $1,700.00 | $500.00 | $0.00 | $0.00 | $2,200.00 | $2,200.00 | $69,909.73 | $16,295.55 | $86,205.28 | |
| Jan-11 | $1,700.00 | $500.00 | $0.00 | $0.00 | $2,200.00 | $2,200.00 | $69,909.73 | $16,878.13 | $86,787.86 | |
| | | | Current total owed to Oxana: | | | $69,909.73 | | | |
| | | | Interest | | | $16,878.13 | | | |
| | | | Total support arrears | | | **$86,787.86** | | | |
| | | | Equalization payment owed (copied from other tab): | | | $21,673.09 | | | |
| | | | 401K owed (copied from other tab): | | | $6,184.33 | | | |
| | | | Total arrears: | | | **$114,645.28** | | | |

Published on *United States Bankruptcy Court* (http://www.canb.uscourts.gov)

Memorandum Decision re:: Concerning Post-Petition Interest on Non-Dischargeable Support Claims

»

- Printer-friendly version [1]

Original Filed October 14, 1999

### UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re: Case No. 98-53331-ASW Chapter 13 Charles Pitt, Debtor
_____ / Case No. 98-53879-ASW Chapter 13 In re: Edward C. &
Pamela R. De Jesus, Debtors _____ / Case No. 98-53883-ASW
Chapter 13 In re: Gary Michael Carucci, Debtor _____ /
MEMORANDUM DECISION CONCERNING POST-PETITION INTEREST ON NON-
DISCHARGEABLE SUPPORT CLAIMS

The County of Santa Clara ("Creditor") objected to confirmation of the Chapter 13 plan filed by the Debtor in
each of the above-numbered cases (collectively, "Debtors"). The plan in each case has been confirmed without
prejudice to determination of the issue raised by the objection of Creditor, which is: when a non-dischargeable
support debt is paid through a Chapter 13 plan in the amount that existed on the date of the bankruptcy petition,
does post-petition interest on such debt constitute a non-dischargeable debt that remains to be paid after
completion of the Chapter 13 plan?

The facts relevant to the subject issue are not in dispute and the matters have been briefed and argued. Debtors
were represented by Edward A. Kunnes, Esq. of Boone, Miller, Prukop & Wolny. Creditor was represented by
Deputy District Attorney Victor Chen, Esq. and Assistant District Attorney Philip L. Strauss, Esq. of the Family
Support Division of the Santa Clara County District Attorney's office.

I. BACKGROUND

Charles Pitt filed a Chapter 13 petition on April 27, 1998, which commenced Case No. 98-53331-ASW.
Creditor asserts a claim for pre-petition child support arrears of $7,792.86.

Edward and Pamela De Jesus filed a Chapter 13 petition on May 14, 1998, which commenced Case No. 98-
53879-ASW. Creditor asserts a claim for pre-petition child support arrears of $17,052.33.

Gary Michael Carucci filed a Chapter 13 petition on May 14, 1998, which commenced Case No. 98-53883-
ASW. Creditor asserts a claim for pre-petition child support arrears of $93,624.85.

In each case, it is unclear whether the parties dispute the extent to which each claim is non-dischargeable and the
extent to which each claim is entitled to priority status. However, the issue currently before this Court concerns
only the non-dischargeable portion (if any) of each claim and, as discussed below, priority status is irrelevant to

that issue.

## II. PARTIES' POSITIONS

Debtors propose to pay through their respective Chapter 13 plans their respective non-dischargeable support obligations in the amounts that were outstanding when their respective Chapter 13 cases were commenced. Creditor concedes that some of the pre-petition support debt in each case may not be entitled to priority under §507(a)(7), but Debtors are nevertheless treating all non-dischargeable pre-petition support debt as if it were entitled to priority status, and there has been no objection to such treatment by the Chapter 13 trustee or by any creditor.

Debtors cite §1322(a)(2), which provides that a Chapter 13 plan must:

provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507 of this title, unless the holder of a particular claim agrees to a different treatment of such claim ....

Debtors point out that this section does not define "full payment" to include payment of interest. They also note that the language of this section differs from that of §1129(a)(9)(B)(i) and §1129(a)(9)(C) concerning priority claims in Chapter 11 cases, which refer to "deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim" -- Chapter 11 permits priority claims to be paid over time (as does Chapter 13) but requires that the amount ultimately paid reflect the claims' present value (as Chapter 13 does not), which necessarily means that some amount in addition to principal (i.e., interest) must be paid in order to compensate the creditor for delay in payment and make the future payment equivalent to a current payment. Debtors argue that, if Congress had intended for "full payment" under §1322(a)(2) to include payment of post-petition interest, it either would have expressly said so, or would have referred to present value as it did in §1129. Accordingly, Debtors contend, if they treat their non-dischargeable pre-petition support debts as priority debts, §1322(a)(2) only requires "full payment" of such debts to the extent that they existed pre-petition and does not call for the payment of any post-petition interest. Debtors argue that, since §1322(a)(2) does not require payment of post-petition interest on priority debts, full payment of the pre-petition amount of their support debts is all that is required to comply with §1322(a)(2) and such compliance operates to discharge them of any obligation to pay post-petition interest on such debts, citing cases from other jurisdictions.

Creditor argues that there is a difference between what is required to confirm a Chapter 13 plan and what is required to discharge a debt. Creditor notes that §1322(a)(2) is one of several criteria for confirmation of a plan, but contends that it does not affect the dischargeability of debts that are the basis of priority claims. Rather, dischargeability is governed by §1328, which excepts support debts from discharge and makes no reference to whether a plan purports to pay such debts in full. Obviously, if a support debt has been paid in full by the time a Chapter 13 plan has been completed (including all accrued interest), no part of the debt will remain unpaid to be excepted from discharge, so the issue would be moot under such circumstances. In this case, however, Debtors do not propose to pay post-petition interest during the terms of their respective plans, so such interest will be outstanding when the plans are completed -- Creditor's position is that such accrued and unpaid interest will remain owing after completion of the plans and will not be discharged under §1328. Creditor cites Bruning v. United States, 376 U.S. 358, 84 S.Ct. 906 (1964) ("Bruning") and In re Pardee, 218 B.R. 916 (9th Cir. BAP 1998) ("Pardee").

## III. ANALYSIS

In Pardee, the concurring opinion of Bankruptcy Judge Klein analyzes interest-bearing debts under Chapter 13 by dividing them into three categories.

The first category is priority debts that can be discharged in Chapter 13 but not in Chapter 7 (i.e., debts for certain taxes). As priority debts, these must be paid in full through a Chapter 13 plan under §1322(a)(2). Although such debts bear interest under non-bankruptcy law, §1322(a)(2) does not require that such interest be paid through the plan, since the section does not refer to interest and does not call for payment of present value - - in fact, Bruning and §502 provide that a claim for post-petition interest on unsecured debt is not allowable against a bankruptcy estate, so an objection to a priority tax claim that included post-petition interest must be sustained as to interest. Under Chapter 7, priority tax debts are non-dischargeable and they therefore remain payable by the bankruptcy debtor post-discharge to any extent that they have not been paid by the Chapter 7 estate -- since post-petition interest on priority tax debts does not constitute an allowable claim, it cannot be paid by a Chapter 7 estate and Bruning holds that such unpaid interest remains owing by the bankruptcy debtor post-discharge. The situation is different in Chapter 13, however, because §1328 provides that priority tax debts are dischargeable -- thus, although post-petition interest on priority tax debts does accrue, if it is not paid through the plan (as it need not be under §1322(a)(2), §502, and Bruning), the bankruptcy debtor is discharged of liability for unpaid post-petition interest.

The second category is priority debts that cannot be discharged in Chapter 13 (i.e., debts for support). Just as with priority tax debts, these priority debts must be paid in full through a Chapter 13 plan under §1322(a)(2). Just as with priority tax debts, support debts bear interest under non-bankruptcy law but §1322(a)(2) does not require that such interest be paid through the plan and a claim for post-petition interest on unsecured debt is not allowable against a bankruptcy estate under §502 and Bruning. Unlike priority tax debts, however, support debts are not dischargeable in Chapter 13 -- therefore, any part of the debt that is not paid during the term of the plan and remains outstanding post-discharge (e.g., post-petition interest) is not rendered unenforceable against the bankruptcy debtor by virtue of the Chapter 13 discharge.

The third category is non-priority debts that cannot be discharged in Chapter 13 (i.e., debts for student loans, certain assigned debts for support, debts for injury caused by driving while intoxicated, and debts based on criminal restitution and fines). Because these debts are not entitled to priority, they need not be paid in full under §1322(a)(2); further, post-petition interest on unsecured debts does not constitute an allowable claim against the estate under §502 and Bruning. Because such debts are non-dischargeable, any part of them that is not paid during the term of the plan and remains outstanding post-discharge (e.g., post-petition interest and any unpaid principal) is not rendered unenforceable against the bankruptcy debtor by virtue of the Chapter 13 discharge.

Judge Klein's analysis is logical and persuasive. It is based upon the unassailable premise that a debt entitled by non-bankruptcy law to bear interest continues to accrue interest until such time as it is either paid or discharged in bankruptcy. If an interest-bearing debt remains partially unpaid and is never discharged in bankruptcy (e.g., statutorily non-dischargeable debts such as taxes in Chapter 7 cases and student loans in all bankruptcy cases, and any debt in a dismissed Chapter 13 case), then any outstanding part of it remains owing. In order for a Chapter 13 debtor to be relieved of any part of a debt -- whether it be a part consisting of post-petition interest or a part consisting of something else -- it is necessary that the debt be dischargeable in the first place. Debts for taxes are discharge- able in Chapter 13, but debts for support are not -- Debtors cite no authority that does not involve dischargeable tax debts, and the rationale of such cases does not apply to the liability of post-discharge Chapter 13 debtors for unpaid parts of non-dischargeable support debts.

The nub of the matter is that interest at contractual rates under nonbankruptcy law continues to accrue

postpetition on all unsecured debt because, even though unmatured interest is not "allowed" by virtue of § 502(b)(9) and cannot be paid by a bankruptcy trustee, the statutory disallowance does not erase the nonbankruptcy obligation to pay interest. Rather, it is the bankruptcy discharge that eliminates the obligation. If the debt is not discharged (which can occur for a host of reasons ranging from denial of discharge to dismissal of case), then the obligation remains. Pardee, at 927.

Debtors argue that it is unfair to permit bankruptcy estates to avoid paying post-petition interest while leaving bankruptcy debtors exposed to non-dischargeable debts for such liabilities that were not paid by their estates. That is a strong policy argument, but the United States Supreme Court decreed such a result in Bruning 35 years ago and Congress has yet to alter the situation. Further, Chapter 13 debtors are not necessarily powerless to solve the problem. For example, a Chapter 13 debtor could propose a plan calling for payment of post-petition interest as it accrued on a support debt and, if there were no objection and the plan met the confirmation requirements of §1325 (i.e., compliance with Chapter 13 and Title 11, good faith, feasibility, and paying unsecured creditors as much as they would receive in Chapter 7), the plan would be confirmable. Or, a debtor's budget might provide for direct payment of post-petition interest on a pre-petition support debt being paid through the plan and, in the absence of objection, a plan meeting the confirmation requirements of §1325 would be confirmable. Or, a debtor might file a claim on behalf of a support creditor as permitted under Rule 3004 of the Federal Rules of Bankruptcy Procedure and seek post-petition interest; if neither the debtor nor any other party in interest objected, the claim would be deemed allowed as filed pursuant to §502(a). In any event, perceived unfairness of the statutory scheme is not a basis upon which this Court can refuse to apply the statute and Debtors have cited no applicable or persuasive authority in support of such a result.

CONCLUSION

For the reasons set forth above, County's objections to confirmation of the Chapter 13 plans in each of these cases are sustained.

Counsel for creditor shall submit a form of order in each case so providing, after review by counsel by Debtors.

Dated: October 14, 1999 _____ ARTHUR S. WEISSBRODT United States Bankruptcy Judge 1 Except as otherwise noted, all statutory references are to Title 11, United States Code (11 U.S.C., the Bankruptcy Code), as amended in October 1994. 2 As discussed above, portions of the support debts in these cases may not be entitled to priority status, but the Debtors are treating the debts in their respective cases as if the debts were entitled to priority. 3 Even if there were an objection, §1322(b)(1) permits unsecured creditors to be classified separately from each other so long as there is no unfair discrimination against any class. Given the public policy favoring support creditors and the unique nature of such debts, separate classification might be warranted under the circumstances of a particular case. CANB DocumentsNorthern District of California

©2007 United States Bankruptcy Court, Northern California. All Rights Reserved.

**Source URL (retrieved on *12/07/2010 - 11:03*):** http://www.canb.uscourts.gov/node/845

**Links:**
[1] http://www.canb.uscourts.gov/print/845

# EXHIBIT "C"

| | |
|---|---|
| **From:** | Brooke L. Miller [brookelmiller@gmail.com] |
| **Sent:** | Monday, March 14, 2011 5:36 PM |
| **To:** | Kari Silva |
| **Subject:** | Re: Stipulation and proposed order for transfer of estate assets |

Thank you Kari. I will address the stipulation soon.



Perhaps you can ask your client, Oxana, to hold off on filing any papers in family law court until next Monday, 3/21/11? I will discuss your offer with the Woottons and get back to you by then. As you've stated a few times before, this case has gone on for quite some time and I know all parties would like it resolved much sooner than later.

Thanks,
Brooke L. Miller, Attorney
Miller Legal Services
(415) 810-8815
brookelmiller@gmail.com

----- Original Message -----
**From:** Kari Silva
**To:** brookelmiller@gmail.com
**Sent:** Monday, March 14, 2011 4:09 PM
**Subject:** Stipulation and proposed order for transfer of estate assets

Brooke:

Attached you will see my suggested modifications to both the stipulation and the order. With the order, I removed #4 as this is in the previous order and not discussed in the stipulation and therefore should not be in the proposed order to transfer funds.

Sincerely,

**Kari L. Silva, Esq.**
CAMPEAU GOODSELL SMITH, LC
440 North 1st Street, Ste. 100
San Jose, California 95112
Tel: 408.295.9555, ext. 103
Fax: 408.295.6606
ksilva@campeaulaw.com

PRIVILEGED AND CONFIDENTIAL: The information contained in this e-mail and any attached documents are confidential, and may be an attorney-client communication subject to the attorney-client or work product privilege. If you are not the intended recipient or the person responsible for delivering the message to the intended recipient, any review, disclosure, copying, distribution, or use of the contents of this e-mail or any attached document is strictly prohibited. If you have received this e-mail in error, please destroy it and notify the sender immediately by telephone (408.295.9555) or e-mail.

IRS CIRCULAR 230 NOTICE: Any tax advice given herein (and in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any matter or transaction addressed herein.

1

# EXHIBIT "D"

**Kari Silva**

| | |
|---|---|
| From: | Brooke L. Miller [brookelmiller@gmail.com] |
| Sent: | Friday, March 18, 2011 11:30 AM |
| To: | Kari Silva |
| Cc: | Wendy Wootton; Alan Wootton |
| Subject: | Re: Alan T. Wootton and Wendy Lynn Wootton |
| Attachments: | Attachment to K Silva e-m 110318 1130am.pdf |

Good morning Kari,

Regarding POC 14, attached please find the proof that all the support payments alleged to be outstanding in the POC were more than fully paid by 3/15/10. I see no reason why POC 14 should not be withdrawn promptly.

My clients will be paying Oxana Wootton what she is legitimately owed, if anything, and that is all. I will be filing an objection to POC 13. As you know, the basis of your client's POCs are the various stipulations/judgments in Alan and Oxana's family law matter. My analysis of those documents, of the evidence of payments made by Alan to Oxana over the years since their divorce, and of Oxana's failure to comply with certain parts of the family court orders and agreements indicates that Oxana owes Alan money. Oxana's failure to comply with the court orders and agreements has hampered her own position and, as such, there is no reason why Alan would reimburse Oxana for costs she incurred as the result of her own actions.

As you also know, the impounded proceeds of the sale of Playdom stock are in the process of being placed in my trust account. The amount of the proceeds is $94,941.90. Given my analysis of POC 13 and the history of this case, the amount in trust more than covers whatever Oxana may be owed in the end.

I am sorry that Sam made any promises to you during his representation of Alan and Wendy Wootton. His promises are not mine and I will not be fulfilling any of them. Clearly, whatever Sam alluded to during his representation of the Woottons was not what they wanted to be done on their behalf. I can tell you that you, along with the trustee and the court, will be receiving more information concerning the Wootton's income, along other information, shortly. I aim to file some amendments ahead of the continued confirmation hearing of 4/5/11.

Needless to say, the Woottons will not be paying anything on POC 13, in six months or otherwise, until the objection to it is resolved. The complaint that Oxana would like to file in family court will hopefully result in clarity on what is owed by Alan to Oxana, if anything. We all look very eagerly toward such resolution.

Have a good weekend,
Brooke L. Miller, Attorney
Miller Legal Services
(415) 810-8815
brookelmiller@gmail.com

----- Original Message -----
From: Kari Silva
To: brookelmiller@gmail.com
Cc: oxanawootton2002@yahoo.com ; 'Greg Anderson'
Sent: Tuesday, March 15, 2011 9:44 AM
Subject: Alan T. Wootton and Wendy Lynn Wootton

Dear Brooke:

1