| | |
|---|---|
| 1 | Brooke L. Miller (CA Bar 266065)<br>MILLER LEGAL SERVICES<br>158 Shrader St., #3<br>San Francisco, CA 94117<br>(415) 810-8815<br>(415) 592-8846 |
| 2 | |
| 3 | |
| 4 | Attorney for Debtors |

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>ALAN T. WOOTTON and<br>WENDY L. WOOTTON,<br><br>Debtors. | Case No. 09-57389-ASW<br><br>Chapter 13<br><br>**NOTICE OF REPLY AND REPLY IN OPPOSITION TO MOTION FOR ORDER DIRECTING PRODUCTION OF DOCUMENTS AND EXAMINATION UNDER BANKRUPTCY RULE 2004**<br><br>Date:     May 17, 2011<br>Time:     1:45 p.m.<br>Location: U.S. Bankruptcy Court<br>          280 1st St., Ctrm. 3020<br>          San Jose, CA<br>Judge:    Hon. Arthur S. Weissbrodt |

PLEASE TAKE NOTICE THAT Debtors ALAN T. and WENDY L. WOOTTON (the "Debtors") hereby oppose the Motion for Order Directing Production of Documents and Examination Under Bankruptcy Rule 2004 (the "2004 Motion") of Interested Party OXANA WOOTTON (the "Interested Party"). The 2004 Motion is not reasonably necessary to protect Interested Party's interests and is an improper discovery method in light of the fact that contested matters between the Debtors and Interested Party are currently pending. Interested Party had resisted attempts to negotiate the terms of the 2004 Motion.

The Reply is based on this Notice, the attached Memorandum of Points and Authorities

1
**REPLY IN OPPOSITION TO 2004 MOTION – Case No. 09-57389**

Case: 09-57389    Doc# 99    Filed: 05/09/11    Entered: 05/09/11 16:59:44    Page 1 of 11

and the Declaration of Brooke L. Miller filed concurrently herewith.

Dated: May 9, 2011                                       Respectfully submitted,

                                           /s/ Brooke L. Miller
                                           Brooke L. Miller, Attorney for Debtors
                                           Alan T. and Wendy L. Wootton

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    STATEMENT OF FACTS**

       The Debtors Alan Wootton ("Alan") and Wendy Wootton filed their bankruptcy case on August 31, 2009. Docket no. 1. Interested Party Oxana Wootton (the "Interested Party") is the former spouse of Debtor Alan Wootton. Declaration of Brooke L. Miller in Support of Reply in Opposition to Motion for Order Directing Production of Documents and Examination under Bankruptcy Rule 2004 (the "BLM Decl."), ¶2. Alan and Interested Party separated on November 11, 2004 and, although their divorce was made final on December 31, 2007, the family court proceedings for their divorce and related issues continue to date. Id. Alan became unemployed in January 2007 and remained so for approximately two years. During his unemployment, Alan live on the savings he had in a retirement account from a previous employer. BLM Decl., ¶3. Various stipulations and orders resulting from the family court proceedings contributed to more financial problems for the Debtors. BLM Decl., ¶4-5. In 2008, Alan was forced to short sale his home. BLM Decl., ¶6. The relationship between the Debtors and Interested Party is contentious at best and abusive at worst. BLM Decl., ¶15.

       Interested Party filed two claims on January 19, 2010. Claims Register nos. 13-1-14-2. The Debtors have stated their belief that the claims of Interested Party are excessive or without merit multiple times. Docket nos. 15, 21, 32, 47, 58, 68 and 81. An Objection to Claim 14 was filed on April 4, 2011. Docket no. 81. In response to the Objection, Interested Party amended Claim 14 on April 15, 2011. Claims Register no. 14-2.

2
**REPLY IN OPPOSITION TO 2004 MOTION – Case No. 09-57389**

Case: 09-57389   Doc# 99   Filed: 05/09/11   Entered: 05/09/11 16:59:44   Page 2 of 11

One year after filing for bankruptcy, the Debtors' income increased after Alan's employer, Playdom, Inc., was purchased by the Walt Disney Company. The Debtors received a cash payout for the proceeds of the sale of Playdom, Inc. stock that they owned. BLM Decl. ¶7-8. As soon as the Debtors learned their income would be increasing, they informed Interested Party by e-mail. Docket no. 85, ¶8. When the initial proceeds payment was made, 3% of it was used as a retirement contribution. BLM Decl., ¶8. The Debtors then placed 70% of the initial payment in trust with their bankruptcy attorney. Docket no. They also provided a full accounting of the use of the remainder of the sale proceeds. Docket no. 85, ¶11.

Due to the increase in the Debtors' income, the Debtors filed amendments to their Schedules I and J and to their proposed Chapter 13 plan on March 30, 2011. The amendments reflected increases in monthly income and expenses and proposed increased plan payments. Docket nos. 78-79.

On or about March 9, 2011, counsel for Interested Party, Kari Silva ("Ms. Silva"), informed the Debtors' counsel that she would be filing the 2004 Motion. She did so the next day and was shortly thereafter directed by the Court to revise the motion after discussing, among other things, the scheduling of the examination and production with the Debtors' counsel. Docket no. 64. Ms. Silva re-filed the 2004 Motion with some revisions on March 28, 2011. Docket no. 76. Prior to the re-filing of the 2004 Motion, the Debtors' counsel told Ms. Silva that she did not believe the 2004 Motion would be proper given that an objection to one of the proofs of claim of Interested Party would shortly be filed. BLM Decl., ¶9. That objection was filed on April 4, 2011. Docket no. 81. Objection to Claim 13 was filed on May 6, 2011. Ms. Silva was told as early as February 8, 2011 that the objections would be filed. BLM Decl., ¶10. The intention to file the objections was confirmed for Ms. Silva in an e-mail from the Debtors' counsel on March 18, 2011. BLM Decl., ¶11.

Debtors' counsel was informed by Debtors on April 20, 2011 that Interested Party, via her family law attorney, issued two subpoenas to Alan's employer, the first on February 23, 2010 and the second on August 27, 2010. BLM Decl., ¶12. Debtors' counsel informed Ms. Silva of the subpoenas on April 24, 2011. In a letter dated May 3, 2011, Ms. Silva stated she was aware of the subpoenas but she did not modified the terms of the proposed stipulation on the 2004 examination. Also on April 24, 2011, Debtors' counsel offered to produce most of the documents requested in the 2004 Motion. The offer was refused. BLM Decl., ¶13.

On April 11, 2011, the Court issued a "Not Signed" order on the 2004 Motion, which directed the parties to attempt to negotiate the terms of the 2004 examination, among other things. Docket no. 89.

## II. ARGUMENT

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

Federal Rule of Bankruptcy Procedure 2004 ("Rule 2004") has often been characterized as a "fishing expedition" and as having unfettered and broad scope. *In re Bennett Funding Group, Inc.*, 203 B.R. 24, 28 (1996). However, Rule 2004 is not without limitations. It is an improper discovery method to use when there is a contested matter pending between the requesting party and the party to be examined. When a requesting party's Rule 2004 request is challenged by the potential examinee, the requesting party must show that the request is reasonably necessary to protect its interests. Even if the requesting party is successful, the potential examinee's interests in avoiding the 2004 examination must be balanced against the requesting party's interests.

### A. Actual Negotiation Has Not Been Attempted by Interested Party.

On April 11, 2011, this Court issued a "Not Signed" order on this matter. Docket No. 89.

Attachment A to the order begins as follows: "Counsel for Oxana Wootton should reconsider what it needs in light of the statements made in the opposition from Debtor's counsel. The parties should attempt to negotiate this matter." Id. Contrary to these instructions, Ms. Silva has not attempted to negotiate with Debtors' counsel. While it is true that the individual document requests made in the 2004 Motion have changed since their original filing date of March 10, 2011, all changes made to the document requests have been court-ordered. Docket Nos. 62, 64, 89. In substance, the document requests are the same as they were when Ms. Silva initially proposed them. Furthermore, Debtors' counsel offered to produce documents to satisfy nine of the 11 requests. BLM Decl., ¶13. In response, Ms. Silva simply repeated the same allegations made in previous communications and refused the offer. Id. Ms. Silva has shown an unwillingness to negotiate.

### B. Contested Matters Between the Debtors and Interested Party Are Pending.

A well recognized limitation of Rule 2004 "is that once an adversary proceeding or contested matter has been commenced, discovery is made pursuant to the Fed.R.Bankr.P. 7026 *et seq.*, rather than by a [Rule 2004] examination." *Bennett Funding* at 28. This is the pending proceeding limitation of Rule 2004. In *Bennett Funding*, the requesting party had filed an adversary proceeding one day before the order granting its 2004 request. *Id* at 26. Ruling on an order to show cause to block the 2004 request, the same court reversed its prior order and blocked the Rule 2004 request due to the pending adversary proceeding. *Id* at 30.

Here, Interested Party filed Claims 13 and 14 against the Debtors on January 19, 2010. She then amended both claims on April 15, 2011. Claims Register nos. 13-14. The Debtors filed objections to both claims. Objection to Claim 14 was filed on April 4, 2011, and Objection to Claim 13 was filed on May 6, 2011. Docket nos. 81, 96. An objection to a creditor's claim is a contested matter. Fed.R.Bankr.P. 9014. Both objections were filed after the 2004 Motion.

But, given the *Bennett Funding* case, that does not matter. The *Bennett Funding* court reversed its own decision to grant the 2004 request because of the newly-pending adversary proceeding. Two contested matters are now pending in this case and therefore a Rule 2004 examination would be improper.

Ms. Silva believes there is no contested matter pending with respect to Claim 14. BLM Decl., ¶13, Exh. C. While amended Claim 14 asserts that $0.00 of the claim is entitled to priority status, its supporting documentation asserts a different story. Claims Register no. 14-2. Page 3 of Claim 14 asserts that, as of April 14, 2011, over $3,000 was outstanding for post-petition support obligations. Id. The Court even noted the discrepancy and notified Ms. Silva electronically. Id. at Remarks section. Debtors' counsel and Ms. Silva discussed Claim 14 further via written communication and, to date, Ms. Silva does not appear willing to amend Claim 14 to clearly value the claim at $0.00. BLM Decl., ¶13, Exh. C. The Debtors will seek a court order disallowing amended Claim 14 in its entirety and therefore a contested matter still exists with respect to Claim 14.

Claim 13 has now been objected to and that objection gives rise to the second contested matter between the Debtors and Interested Party. Docket No. 96. Although it was only recently objected to, Ms. Silva was told as early as February 8, 2011 that the Claim 13 objection would be made. BLM Decl., ¶10. That intention was confirmed for Ms. Silva in writing on March 18, 2011. BLM Decl., ¶11. Given the discrepancy in amended Claim 14 and the pending objection to Claim 13, there are two contested matters pending in this case and, therefore, the 2004 Motion should be denied as any discovery conducted pursuant to Rule 2004 would be improper.

**C. The 2004 Motion of Interested Party Is Not Reasonably Necessary to Protect Her Interests Because They Already Protected.**

If a debtor challenges the right of the examiner to conduct a Rule 2004 examination, the examiner must establish that good cause exists for taking the examination. Good cause is

established where the examiner shows that the examination is reasonably necessary for the protection of its legitimate interests. *In re Hammond*, 140 B.R. 197, 201 (1992).

Here, for a number of reasons, Interested Party cannot show that the 2004 Motion is reasonably necessary to protect her legitimate interests. In the first place, Interested Party may already have some of the documents she requests in the 2004 Motion. She has already been ordered to revise the document productions requests after the Debtors showed she had much of the requested information. Docket no. 89. Although revisions were made, Interested Party may have even more of the documents she is requesting due to the fact that, via her family law attorney, she has issued two subpoenas to Alan's employer. In large part, the two subpoenas requested the same information Interested Party is requesting again. BLM Decl., ¶12, Exh. B. The Debtors believe both subpoenas were responded to and that documents were produced. BLM Decl., ¶12. Due to the first subpoena, issued on February 23, 2010, Interested Party may have more documents in her possession than she claims presently, particularly with respect to the first document request.

The second way in which Interested Party's interests are protected concerns her repeated, baseless allegations of fraud. Searching for fraud is a valid use of the Rule 2004 examination. In the *Hammond* case, a credit card company attempted to determine whether the debtor had committed fraudulent acts in applying for the company's credit line. Information in the case indicated that the debtor had no income at the time he had applied for the credit line. *Id* at 199. Initially denied its Rule 2004 request, on appeal, the District Court reversed the bankruptcy court's decision and the creditor was allowed to proceed with the 2004 examination. *Id* at 202. Information available to the creditor prior to its Rule 2004 examination was sufficient to justify an investigation for fraud. Here, that is simply not the case. While Interested Party uses some facts in this case to support her allegations of fraud, her allegations has never been properly pled.

Fed.R.Bankr.P. 7006. Also, she continues to ignore the rest of the facts.

Interested Party has alleged fraud on the Debtors' part due to the fact that bonuses which Alan received in 2010 are not listed in the bankruptcy schedules. Docket no. 92, Declaration of Ms. Silva, ¶6. Interested Party ignores the fact that the Debtors' bankruptcy case was filed in August 2009, prior to receipt of the 2010 bonuses. Interested Party makes no allegation that the Debtors knew the bonuses would be received. Interested Party also ignores the fact that there is no logical reason to list the 2010 bonuses in the schedules that have been amended since Schedules I and J deal entirely with current monthly income and expenses.

Interested Party further alleges fraud on the part of the Debtors because Alan, while experiencing long-term unemployment and having lost his house in a short sale, lived on his retirement account savings from a previous employer. BLM Decl., ¶¶3, 6. Interested Party alleges Alan's actions were fraudulent because the retirement account savings belonged to both of them. BLM Decl., ¶13, Exh. C. Here again, Interested Party is ignoring the facts. First, whether or not any of the retirement account savings belonged to Interested Party is an open issue for the family court to decide. See Objection to Claim 13, Docket no. 96. Second, Interested Party's unsecured claim against the retirement account savings is for a mere $6,184.33. Claims Register no. 13-2. Even if Interested Party is able to prove her claim is legitimate, the claim is protected by the current Plan payments.

Another fraud allegation of Interested Party involves the facts surrounding the Debtors' increased income due to the purchase of Alan's employer by a large company, which resulted in an initial payment and continued monthly income from the sale of Playdom, Inc. stocks. Even if Interested Party had pled her fraud allegations properly, the pleading would be insufficient because of all the facts, to wit: Prior to receipt of the initial payment of increased income, the Debtors informed Interested Party that their income was going to increase. Docket no. 85, Exh.

A. A mere two months after receiving the initial payment, the Debtors placed seventy percent of it in trust, 3% in a retirement account, and fully accounted for expenditures for which the remainder of the initial payment was used. Such expenditures included a payment to the Debtors' family law attorney and the purchase of a used car, which was needed to replace a broken one. Docket no. 54. The car purchase, the payment to the attorney and the retirement contribution were all reasonably necessary expenditures within the bounds of §1325 of the U.S. Bankruptcy Code. Given that Interested Party had recently been granted relief from the automatic stay in order to resume family court litigation against the Debtors (see Docket no. 52), the payment to the attorney was entirely reasonable and necessary. The same is true for the retirement contribution, especially in light of the fact that Alan is 55 years old, earns all the income the Debtors have, and supports four children, all of whom are all still in their minority. BLM Decl., ¶¶16-17.

With respect to the continued income from the Playdom, Inc. stock sale proceeds, the Debtors have acted in complete honesty. At first, it was not clear to the Debtors whether the new income was property of the bankruptcy estate. The question was put before the Court via an adversary proceeding, which did not close until December 30, 2010. Docket no. 46. Near the same time the adversary proceeding was filed, the Debtors had become unhappy with their counsel and began searching for a replacement bankruptcy attorney, as was their absolute right. Given the age and complexity of their bankruptcy case, finding a replacement attorney was not easily accomplished. Less than 2 months after hiring a new attorney, the Debtors filed amended Schedules I and J, as well as an amended Plan. Docket no. 78-79. The amendments both fully disclosed the Debtors' new income and increased the Plan payments by 357%. When it comes to the Debtors' increased income from Playdom, Inc. stock, they have fully disclosed, under penalty of perjury, all of the income they have and do receive. Id.

Lastly, the legitimate interests of Interested Party are not as valuable as she claims. Claim 14 should be disallowed entirely. Objection to Claim 13 shows that Claim 13 is worth approximately 25% of the amount claimed therein. Docket no. 96. Even if Objection to Claim 13 is not resolved as favorably for the Debtors as it asserts, the Debtors are confident that Claim 13 is worth far less than it asserts.

Even if Interested Party could show her legitimate interests need the protection of a Rule 2004 examination, a balance of her interests versus the Debtors' interests in avoiding the examination is required under the *Hammond* case. *In re Hammond*, 140 B.R. 197, 201 (1992). Also, a Rule 2004 examination cannot be used to harass or abuse the debtor. *Id*. Here, the demonstrated behavior of Interested Party shows that the Debtors' interest in obtaining the fresh start afforded by bankruptcy protection is a greater interest than any Interested Party may have.

First, Interested Party has caused some of the Debtors' financial trouble. On March 12, 2008, Interested Party failed to turn over to the Debtors sale proceeds of Alan's share in her eBay stock options, contrary to court order. BLM Decl., ¶5. At the time, Alan was unemployed and close to losing his home. BLM Decl., ¶3. The stock sale proceeds would have gone a long way toward preventing Alan's further financial harm.

Second, Interested Party has a history of abusing the Debtors. As a creditor, she violated the automatic stay immediately after the Debtors' case was filed by sending Alan an e-mail demanding payment of pre-petition debt. BLM Decl., ¶15, Exh. E.. She continued to engage in similar behavior throughout the bankruptcy case via e-mails she sent to the Debtors demanding information about their case. Such behavior by a creditor has resulted in the imposition of sanctions. In *In re Dayley*, a creditor was sanctioned for sending post-petition automatic billing statements to the debtors. *In re Dayley*, 349 B.R. 825, 827 (2006). The creditor was found to have willfully violated the automatic stay. *Id*. at 830. Here, nothing about Interested Party's

post-petition e-mails that demand payment on pre-petition debts and more information regarding the Debtors' case was automatic. Interested Party's behavior is even more willful that the sanctioned creditor in *Dayley*.

Interested Party has further abused the Debtors in her e-mails. BLM Decl., ¶15, Exh. E. She has implied drunkenness and illegal and immoral behavior by the Debtors. She has indicated a desire to keep the Debtors' family apart from one another. Id. Overall, Interested Party's behavior demonstrates that the Debtors' interest in gaining the fresh start afforded by bankruptcy protection is in greater need of protection than any interest she may have.

In summary, the Debtors actions throughout their bankruptcy case were taken in the interest of full disclosure and fairness. The same cannot be said for the actions of Interested Party.

### III. CONCLUSION

For the reasons discussed above, Interested Party's Motion for Order Directing Production of Documents and Examination Under Bankruptcy Rule 2004 should be denied.

Dated: May 9, 2011  MILLER LEGAL SERVICES

/s/ Brooke L. Miller
Brooke L. Miller
Attorney for Debtors Alan T. and Wendy L. Wootton